**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ACE HARDWARE INTERNATIONAL | ) | |
| HOLDINGS, LTD., as assignee of ACE | ) | |
| HARDWARE CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO. 11 CV 03928 |
| | ) | |
| | ) | Honorable Amy J. St. Eve |
| | ) | |
| v. | ) | |
| | ) | |
| MASSO EXPO CORP.  and CAGUAS | ) | |
| LUMBER YARD, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO MOTION TO DISMISS FOR LACK OF PERSONAL**
**JURISDICTION OR, IN THE ALTERNATIVE, TO TRANSFER THIS ACTION**

David J. Fish
The Fish Law Firm, P.C.
1770 N. Park St., Suite 202
Naperville, IL 60563
(630) 355-7590

# TABLE OF CONTENTS

PAGE

Table of Authorities…………………………………………………………………....…i

Introduction…………………………………………………………………………………1

Facts………………………………………………………………………………………2

Headquartered In Illinois, Ace Operates As A Co-op To Allow Retailers, Like
Defendants, To Save Money And Participate In Group Decision Making……………2

Defendants Are Large And Sophisticated Businesses……………………………………3

Defendants Are One Of Ace's Largest Owners……………………………………………4

Defendants Received Millions In Co-op Patronage Dividends From Illinois…………..4

Defendants' Co-Op Relationship Was Administered In Illinois………………………...5

Applications for Membership……………………………………………...5

Contractual Agreements………………………………………………………5

Membership Agreements…………………………………………5

Guaranty……………………………………………………...…5

Co-Op By-Laws……………………………………………………6

Drop-Shipments/Illinois Statute of Frauds………………………...…6

Ordering……………………………………………………………………6

Credit Review Meetings……………………………………………………7

ACENET………………………………………………………………………7

Billing………………………………………………………………………7

Payment……………………………………………………………...……7

Co-Op Advertising Programs……………………………………………7

Annual Meetings Are In Illinois/Conventions Are Coordinated in Illinois………7

Training……………………………………………………………………8

Loans…………………………………………………………………………8

Records and Witnesses Are Located In Illinois………………………………………8

Ace Has Provided Defendants With Hundreds Of Thousands Of Dollars In
Credits For Payment Disputes From Illinois…………………………………………8

Last Year, Defendants Ordered Huge Quantities Of Merchandise Without Paying And
Defaulted On Their Own "Debt Elimination Plan"……… …………………...............9

Argument……………………………………………………………………………...….10

This Court Has Personal Jurisdiction Over Defendants…………………………….....10

Legal Standard……………………………………………………………...…10

Personal Jurisdiction Exists Over Defendants Even Without Their
Agreement To Suit In Illinois…………………………………………………10

Defendants Consented To Illinois Venue………………………………...13

Puerto Rico Law Does Not Prohibit This Action From Proceeding In
Illinois………………………………………………………………………...14

This Case Should Not Be Resolved in Puerto Rico…………………………………15

Private Interest  Factors………………………………………………………...….17

Ace's Choice of this Forum is Entitled to Substantial Weight……………..…….17

Situs of Material Events…………………………………………………….....18

Sources of Proof and Convenience to Parties and Witnesses…………………..18

Public Interests Factors Do Not Favor A Transfer……………………………………19

**Relation of Locale to the Controversy……………………………………………..19**
**Speed of Proceeding……..……………………………………………………..…19**
**Court's Familiarity with Law.………………………………………………...20**
**Conclusion………………………….……………………………………………...20**

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                      **PAGE**

*AAR Intern., Inc. v. Nimelias Enterprises S.A.*, 250 F.3d 510 (7th Cir. 2001)..............................16

*Ace Hardware Corp. v. Celebration Ace Hardware, LLC, et al.*, 2009-cv-00066
(N.D. Ill. 2009)…………………………………………………………………………..12

*Aguakem Caribe, Inc. v. Kemiron Atlantic, Inc.*, 218 F. Supp. 2d 199 (D.P.R. 2002)............15, 16

*Am. Roller Coast. Co. LLC v. Foster Adams Leasing, LLP*, 421 F.Supp.2d 1109
(N. D. Ill. 2006)…………………………………………………………………………14, 16

*Antilles Cement Corp. v. Aalborg Portland A/S*, 526 F.Supp.2d 205 (D.P.R. 2007)...................15

*BMJ Foods P.R, Inc. v. Metromedia Steakhouses Co., L.P.*, 562 F. Supp.2d 229
(D.P.R. 2008)....……………………………………………………………………… 15, 16, 20

*Casio Comp. Co. v. Noren*, 2001 WL 893813 (N.D. Ill. 2001)....................................................17

*CCA Global Prsp., Inc. v. Yates Carpet, Inc.*, 2005 WL 2406018 (E.D. Miss. 2005);
*vacated on other grounds* 2005 WL 2671335................................................................12

*Chimney Rock Public Power Dist. v. Tri-State Gen. & Trans. Ass'n, Inc.*, 2010 WL 3328262
(D. Neb. 2010)...........................................................................................18

*Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir. 1986)..............................................16, 17

*Diaz-Rosado Perfect Shine v. Auto Wax Company, Inc.*, 2005 WL 2138794
(D.P.R. 2005)..............................................................................................15, 20

*Drayton Grain Processors v. NE Foods, Inc.*, 2007 WL 983825 (D.N.D. 2007).........................12

*First Nat'l Bank v. E Camino Res.Ltd.*, 447 F.Supp. 2d 902 (N.D. Ill. 2006).........................17, 19

*Heller Fin., Inc. v. Mid. Powder Co. Inc.*, 883 F.2d 1286 (7th Cir.1989)....................................19

*Hinc v. Lime-O-Sol Co.*, 231 F.Supp.2d 795 (N.D. Ill. 2002).......................................................17

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154 (1945)................................................10

*John Boutari and Son v. Attiki Importers*, 22 F. 3d 51 (2d Cir. 1994).........................................14

*Landis v. Warner Chilcott (US), LLC*, 2010 WL 5373664 (N.D. Ill. 2010)..................................17

*Marel Corp. v. ENCAD Inc.*, 178 F. Supp.2d 56 (D.P.R. 2001).....................................................15

*Maxon Eng'g Servs., Inc. v. U.S. Sci., Inc.*, 34 F. Supp.2d 97 (D.P.R. 1989)...............................15

*Mayoral v. Sheanhan*, 1998 WL 381699, 96 c 7249 (N.D. Ill. 1998)...........................................17

*Medika Intern., Inc. v. Scanlan Intern., Inc.*, 830 F. Supp. 81 (D.P.R. 1993)..............................15

*MetroMedia*, 562

*Metzger v. SleeceCo, Inc.*, 2010 WL 563073, 2009 cv 6071 (N.D. Ill. 2009)...............................19

*M/S Breman v. Zapata Off-Short Co.*, 407 U.S. 1 (1972)...............................................................16

*Mullins v. Equifax Inf. Serv., LLC*, 2006 WL 1214024 (E.D. Va. 2006)......................................17

*Nat. Fire Ins. Co. of Hartford v. Nat. Cable TV Co-op., Inc.*, 2011 WL 1430332
(D. Kan. 2011)...……………………………………………………………………………12

*NW. Nat. Ins. Co. v. Donovan*, 916 F.2d 372 (7th Cir. 1990)................................................13, 16

*Outek Caribbean Dist., Inc. v. Echo, Inc.*, 206 F.Supp.2d 263 (D.P.R. 2002).............................16

*Pan American Comp. Corp. v. Data Gen. Corp.*, 467 F.Supp.969 (D.P.R. 1979).......................15

*Pava v. Drom Intera., Inc.*, 8 F.Supp.2d 1062 (N.D. Ill. 1998)....................................................17

*Puerto Rico Sur. Tech, Inc. v. Applied Med. Dist. Corp.*, 2010 WL 4237927 (D.P.R. 2010).......15

*Purdue Research Found. v. Sanofi-Syntelabo, S.A.*, 338 F.3d 773 (7th Cir. 2003)......................10

*Royal Bed and Spring Co. v. Famossul Industria e Comercia de Moveis Ltda.*, 906 F.2d 45
(1st Cir.1990)...............................................................................................………...15

*RR Donnelley & Sons Co. v. Hays Intern. Markt. Ser., Inc.*, 1999 WL 284798
(N.D. Ill. 1999)...……………………………………………………………………19, 20

*Servistar Corp. v. The Home Hardware Co.*, 96 B.R. 593 (W. D. Penn. 1989).....................11, 18

*TruServ Corp. v. ST Yards, Inc.*, 2001 WL 743642 (N. D. Ill. 2001).....................................11, 13

*United Airlines v. Messa Airlines, Inc,* 8 F.Supp.2d 796 (N.D. Ill. 1998)....................................18

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559 (1980)......................10

**STATUTES**

28 USC § 1404(a).................................................................................................................16, 17

735 Ill. Comp. Stat. 5/2-209(a)(1), (7), (10)....................................................................10

735 Ill. Comp. Stat. 5/2-209(c).........................................................................................10

10 P.R. Laws Ann. § 278(b-2)...........................................................................................14

## Introduction

This case is intimately connected with this Judicial District because Ace Hardware Corporation ("Ace"), a retailer-owned hardware cooperative ("co-op"), is headquartered in Oak Brook, Illinois. Since Ace is owned by its independent retailers or "members", its members are the ones financially impacted when other members do not pay for merchandise they order.

Defendants are a behemoth Ace co-op member. They were one of the largest Ace members in the world (#3 out of Ace's thousands of retailers) and have tens of millions of dollars in yearly revenue. In fact, the Defendants have owned so much Ace stock that their holdings placed them among the top 1% of co-op members in the entire world and their purchases from Ace have constituted as much as 31% of Ace's international division's sales.

For years, Ace painstakingly waited as Defendants: (i) misrepresented when they would make payments for merchandise, (ii) unilaterally dictated what they would pay for, (iii) failed to meet their own payment plans, and (iv) filed for bankruptcy reorganization. Despite all this, Ace stood by and supported these Defendants--even writing off hundreds of thousands of dollars that should have been paid to the co-op.

However, when the Defendants' outstanding balance climbed to nearly $3 million and their "check is in the mail" excuse was no longer believable, Ace filed this lawsuit to protect itself and its hardworking co-op members.

Despite being a leading member of an Illinois-based co-op, the Defendants now want to force Ace to litigate this lawsuit in Puerto Rico, claiming that this Court lacks personal jurisdiction over them and/or that litigating in Puerto Rico is more convenient. In an apparent effort to support these arguments, Defendants filed a frivolous lawsuit in Puerto Rico against

Ace nearly a quarter year after Ace filed this lawsuit and shortly before they filed their Motion to Dismiss. Defendants' Motion must be denied for the following reasons:

*First*, this Court has personal jurisdiction over Defendants as they were multi-million dollar owners of an Illinois-based co-op from whom they have ordered hundreds of millions of dollars in merchandise, received millions of dollars in "patronage" dividends, and received extensive support and benefits for approximately a quarter of a century. Beyond this, they "agreed" and "consented" on at least eleven occasions that Ace could sue them in Illinois.

*Second*, there is no basis to have this case heard anywhere other than in Illinois, the worldwide headquarters of Ace. The *forum non conveniens* factors strongly favor Illinois and Defendants have failed to provide a proper evidentiary basis to have the case heard elsewhere.

As such, Defendants' Motion should be denied.

### Facts

### Headquartered In Illinois, Ace Operates As A Co-op To Allow Retailers, Like Defendants, To Save Money And Participate In Group Decision Making.

Founded in 1924 by a group of Chicago hardware store owners, Ace operates as a cooperative that purchases merchandise in bulk and allows its individual members like the Defendants to purchase merchandise in smaller quantities to save money. This allows its members' stores to compete effectively at retail with larger stores in their markets. Ace is owned entirely by its independent store owners--like Defendants. No Ace stock is publicly traded. Rather, when retailers affiliate with Ace, they purchase shares of Ace, which gives them, among other things, voting rights. (Declaration of Ting, attached hereto as Exhibit 1 at ¶¶ 3-4)

Ace's retailers control its operations as its Board of Directors has between nine and twelve director positions, a minimum of eight of which are Ace store owners. (Exhibit 1 at ¶5) Since Defendants became Ace co-op members, Oak Brook, Illinois has been Ace's worldwide

headquarters and principal place of business where more than eight hundred of its employees work; hundreds more work in other Illinois-based locations. (Exhibit 1 at ¶6) (*Id.* at )[1]

### Defendants Are Large And Sophisticated Businesses

Defendant Caguas Lumber Yard, Inc. ("Caguas") is the second largest retail construction material supplier in Puerto Rico, ranking 83 out of Puerto Rico's top 400 companies. (*See* Exhibit 2, Plan of Reorganization, at pp. 7-10)[2] It has annual sales of approximately $54 million with a gross margin of approximately 30%. *Id.* at 10-11. It operates from a 21-acre facility and seven additional locations ranging in size from 13,500 to 89,000 square feet. It also sells homes and has model home displays. *Id.* at 7-8. Defendant Masso Expo, Corp. ("Masso") purchased six large Builder Square stores that were similar to a Lowe's or Home Depot store. Eventually Masso sold these stores to The Home Depot, and it continued to operate hardware stores and conduct building material sales. *Id.* at 8. Defendants and their related entities own tens of millions of dollars in real and personal property. *Id.* at 19-23. They also own MEC Investment, Inc., which can produce 36,000 blocks of concrete to be sold to Defendants' customers daily. *Id.* at 9. Defendants have over 500 employees. *Id.*

---

[1] Ace Hardware International Holdings, Ltd. ("Ace International") is an Ace subsidiary that was formed last year and is owned in part by Ace and in part by its international retailers. At the beginning of 2011, certain of the rights and obligations of Ace were assigned to Ace International. Almost all (99% +) of the Defendants' outstanding balance was incurred with Ace. At all times relevant to this lawsuit and Defendant's Puerto Rico lawsuit, Ace International had no separate employees who worked with Defendants. Ace International members continue to purchase their merchandise from Ace and continue to receive the benefits of Ace's co-op organization. (Exhibit 1 at ¶7)

[2] Defendants' Joint and Consolidated Disclosure Statement and Summary of Proposed Plan of Reorganization is approximately 30 months old. As such, some of the information may not be up to date. As set forth in the Plan of Reorganization at p. 17, Defendants assumed executory contracts with Ace as part of the bankruptcy. (Exhibit 1 at ¶12)

Defendants were founded by Gildo Masso, founder of Masso Enterprises, which reportedly has $65 million in annual sales.[3] Masso Enterprises has built hundreds of homes in Puerto Rico and has many successful businesses. *Id.*

### Defendants Are One Of Ace's Largest Owners

During 2010, Defendants owned more than $2 million in Ace stock--placing them among the top 1% of Ace owners in terms of stock holdings in the entire world. In fact, the Defendants were the third largest holder of Ace stock out of thousands of Ace retailers throughout the world and their sales have constituted as much as 31.3% of Ace's international sales. Prior to 2010, Defendants had been paid by Ace, from Illinois, millions of dollars for other Ace stock. For example, when Defendants sold their stores to The Home Depot, they were paid approximately $1.5 million by Ace, from Illinois, for their Ace stock. (Exhibit 1 at ¶¶ 8-9)

Ace administers Defendants' stock from Illinois. Defendants executed at least 17 Stock Subscription Agreements and agreed, "to pay the Total Purchase Price for the shares [hereby subscribed for] at the principal office of Ace [in] Oak Brook, Illinois". These agreements were effective "only upon its acceptance by [Ace] at its principal office in Oak Brook, Illinois" and are identified as being agreed to in "Oak Brook, Illinois". (Exhibit 1 at ¶ 10)

### Defendants Received Millions In Co-op Patronage Dividends From Illinois

Patronage dividends are essentially amounts of money paid by Ace (through cash, stock and interest-bearing loans called patronage certificates) to its members. (Exhibit 1 at ¶ 11) In the past 15 years of the parties' relationship alone, Defendants received from Ace approximately $8 million in patronage dividends. (Defendants' Memorandum in Support of Motion to Dismiss, Ex. B at p. 12; Exhibit 1 at ¶ 11) The patronage certificates are identified as being "Issued at

---

[3] *See* http://en.wikipedia.org/wiki/Gildo_Massó

Oak Brook, Illinois" and are signed by two Ace officers in Illinois. Ace's stock and patronage dividends are overseen by Ace's accounting, tax, and treasury departments, all of which are located in Illinois. (Exhibit 1 at ¶¶ 10-11)

### Defendants' Co-Op Relationship Was Administered In Illinois

Defendants' relationship with Ace, in almost every aspect, was administered from Illinois. For example:

1. **Applications For Membership:** Before opening each of their many stores, Defendants submitted to Ace, in Illinois, a Membership Application. Ace would, in turn, open and maintain a new store file in Illinois. (Exhibit 1 at ¶ 12)

2. **Contractual Agreements:**

(a) **Membership Agreements:** For each store, Defendants executed a Membership Agreement that was not effective until it was "accepted and countersigned by [Ace] at its principal office in Illinois" and Illinois is, in fact, where Ace executed these contracts. In a section entitled, "Application of Illinois Law; Enforcement in Illinois Courts", each of the many Membership Agreements state (Exhibit 1 at ¶ 13) that "[t]he Member hereby consents and agrees that: ***

> (b) any suit brought by the Company against the Member to enforce any provision of this Agreement or seeking any relief in connection with or arising out of the relationship between the Company and the Member may be instituted in an appropriate court in the State of Illinois, unless institution of such suit in Illinois is prohibited by the laws of the jurisdiction in which the member location is situated."

(b) **Guaranty:** Defendant Caguas and other Defendant-related entities signed a Guaranty of Credit addressed to Ace in Illinois that guaranteed Defendant Masso's financial obligations. The Guaranty of Credit was "governed by and construed in accordance with the laws of the State of Illinois" and executed "at Oak Brook, Illinois". (Exhibit 1 at ¶ 13(b))

(c) **Co-op By-Laws:** Ace's By-Laws call for annual meetings to be in Illinois and define a "Business Day" pursuant to Illinois bank openings. (Exhibit 1 at ¶ 13(c))

(d) **Drop-Shipments/Illinois Statute of Frauds**: When using drop ship orders (where Defendants would place orders directly with Ace's vendors and Ace would pay those vendors directly from Illinois), Ace and Defendants used electronic orders whereby Caguas agreed to waive the statute of frauds "adopted in the State of Illinois". (Exhibit 1 at ¶13(d))

3. **Ordering**: Defendants have ordered approximately $250 million in merchandise from Ace in Illinois. (Masso Motion, Ex. B, p 12; Exhibit 1 at ¶14) These orders were transmitted electronically into Illinois by agreement: "All orders for merchandise, supplies and services placed by [Defendants] pursuant to this Agreements shall be transmitted to [Ace] at [its principal office in Illinois]" (Exhibit 1 at ¶14)

Defendants purchased millions of dollars in paint directly from Ace's Illinois-based paint plant. In fact, Ace private-labeled a "Masso" brand paint that was manufactured and labeled in Illinois. There is still approximately $130,000 worth of this "Masso" brand paint sitting in Ace's inventory in Illinois; Defendants have not paid for it. For the other merchandise Defendants' ordered, they submitted orders electronically into Illinois. Ace's Illinois employees would then authorize the merchandise's release from outside of Illinois. All orders are placed, and all replenishment and inventory management occurs, in Illinois. (Exhibit 1 at ¶ 14) Ace's buyers, an important part of a co-op organization, also work in Illinois. (Exhibit 1 at ¶ 21)

4. **Credit Review Meetings:** Ace employees had weekly meetings in Illinois regarding the amount of credit to extend to Defendants. On a weekly basis, Ace employees performed a credit check (*i.e.*, analysis of payment history, security, and related factors) in light

of Defendants' ever-increasing balance. Ace also holds monthly credit committee meetings in Illinois--Defendants were frequently discussed due to their payment problems. (Exhibit 1 at ¶ 15)

5. **ACENET:** Ace invested millions of dollars developing "ACENET"--a computer system that allows retailers to obtain benefits via the internet and which is fully supported from Illinois. Defendants regularly used ACENET and, as set forth in Defendants' ACENET Agreements, they connected directly to "Ace's corporate computer equipment at its corporate offices in Oak Brook, Illinois". (Exhibit 1 at ¶ 16)

6. **Billing:** For decades, Ace employees in Illinois have printed detailed billing statements in Illinois and mailed them to Defendants on a bi-monthly basis. (Exhibit 1 at ¶17)

7. **Payment:** Accounts receivable is administered in Illinois. Defendants paid hundreds of millions of dollars to Ace in Illinois at its Illinois-based bank. (Exhibit 1 at ¶ 18)

8. **Co-Op Advertising Programs:** Ace provided Defendants tens of thousands of dollars from its Illinois-administered advertising co-op fund and provided financial assistance to Defendants by, for example, matching some of their advertising expenses through Ace vendor contributions. The Membership Agreements require that Defendants pay for part of the co-op's national and regional advertising programs. All aspects of the co-op and advertising programs are coordinated from Illinois, and all payments originate from Illinois. (Exhibit 1 at ¶ 19)

9. **Annual Meetings Are In Illinois/Conventions Are Coordinated In Illinois:** All Ace owners, including Defendants, have the right to attend Ace's Illinois-based annual meetings and to elect its directors. Defendants have participated by sending their ballot for directors into Illinois. (Exhibit 1 at ¶ 24) Likewise, twice a year, Ace holds a large convention for its co-op members, and others, to meet, receive training, learn about new products, and otherwise benefit from co-op membership. An entire Ace department works in Illinois to

7

administer these conventions. Defendants have sent their representatives to attend Ace conventions. The conventions have never been held in Puerto Rico. Most recently, Ace held the convention in Chicago at McCormick Place. (Exhibit 1 at ¶ 20)

**10.** **Training:** Defendants received training from Ace in Illinois. For example, in September 2007, Defendants' employees attended Ace's "Top Gun Retailing" program in Oak Brook, Illinois and in July 2005 attended Ace's "Color Your Life" program in Matteson, Illinois. (Exhibit 1 at ¶ 25)

**11**. **Loans:** Ace provided Defendants at least six loans, totaling $120,000.00, that were paid from and repaid into Illinois. (Exhibit 1 at ¶ 26)

<u>**Records and Witnesses Are Located in Illinois**</u>

Most of this case's witnesses live in Illinois. Exhibit 1 identifies twelve Illinois-based witnesses and the subject matter of their knowledge. (Exhibit 1 at ¶ 22) Ace's records are also located in Oak Brook, Illinois. These include more than a quarter century of files (most of which are not kept electronically), broken down separately for each of Defendants' stores. (*Id.* at ¶ 23)

<u>**Ace Has Provided Defendants With Hundreds Of Thousands
Of Dollars In Credits For Payment Disputes From Illinois.**</u>

For years, Defendants leveraged their size and repeatedly requested that the co-op write off debt. In response to Defendants' requests, Ace's practice was to hold meetings in Illinois and Ace often agreed to write off tens of thousands of dollars at a time to appease the Defendants. Then, in 2008, Defendants filed for bankruptcy protection due to the claimed "abusive and unjust actions" of their bank. Ace, through its Illinois-based counsel, worked with Defendants throughout the bankruptcy process and voluntarily reduced by $369,865.57 what was owed to allow Defendants to emerge from bankruptcy. (Exhibit 1 at ¶¶ 27-30) After their bankruptcy

ended, Defendants continued to request reductions from Ace and discussions in Illinois about reducing tens of thousands of dollars in additional debts continued.  (Exhibit 1 at ¶¶ 31-32)

### Last Year, Defendants Ordered Huge Quantities Of Merchandise Without Paying And Defaulted On Their Own "Debt Elimination Plan".

During 2010, the amount Defendants owed to Ace increased dramatically because they were ordering substantial sums of merchandise--but not keeping up with payments. For example, in July 2010, Defendants ordered more than $1 million in merchandise--but paid Ace less than $125,000.  As such, by July 31, 2010, Defendants had a past due balance of $2,183,291.21 and a total balance due of $3,130,260.20.  As a result, several Illinois-based Ace employees had more discussions with Defendants about their account.  (Exhibit 1 at ¶ 33)

On August 3, 2010, Defendants submitted to Ace in Illinois, a formal 19-page plan (the "Debt Elimination Plan") detailing how they would pay off the outstanding balance that was owed to Ace through three different possibilities-- a "Best Case Scenario", a "Most Likely Scenario" and a "Worst Case Scenario".  Defendants emphasized that regardless of which scenario was used, Ace would be paid by November 30, 2010 because Defendants' commitment to pay off past due invoices on a weekly basis.  (Exhibit 1 at ¶¶ 34-35)

The first week after this payment plan was established by Defendants, they made their required payments.  Each week thereafter, however, the Defendants failed to make the required payments.  In fact, throughout 2010, Defendants repeatedly told Ace's employees in Illinois that payments would be made by a certain date and failed to follow through.  As such, by November 30, 2010, the debt was not repaid; Defendants still owed millions to Ace. A few months later, in February 2011, Defendants went back to their practice of asking Ace to voluntarily reduce the balance owed.  Shortly thereafter, Ace filed this suit.  (Exhibit 1 at ¶¶ 35-37)

## ARGUMENT

### I.   THIS COURT HAS PERSONAL JURISDICTION OVER DEFENDANTS.

Defendants argue that Ace's "only predicate for personal jurisdiction" is the "choice of law" and "choice of forum" clauses (Memo, p.3) and therefore make three arguments claiming the Court lacks personal jurisdiction: First, that the "forum" clause is not "self-executing" because it is permissive.   Next, that Puerto Rico law bars the "forum" clause.   Finally, that without the "forum" clause, there is no jurisdiction.  (Memo, pp. 4-14)

1.   **Legal Standard:**  The Court may exercise personal jurisdiction over defendants that have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"   *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Minimum contacts exist where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there."  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).  In determining whether such minimum contacts exist, all factual disputes are resolved in favor of Plaintiff.  *Purdue Research Found. v. Sanofi-Syntelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). [4]

### 2.   Personal Jurisdiction Exists Over Defendants Even Without Their Agreement To Suit In Illinois:

Defendants argue extensively that their consenting to Illinois venue should not count in the personal jurisdiction analysis.  (Memo, pp. 4-12)  This argument misses the mark because,

---

[4] The Illinois long-arm statute contains a "catch-all" provision that permits personal jurisdiction to the maximum extent allowed under the Federal Constitution. 735 Ill. Comp. Stat. 5/2-209(c).  In addition, jurisdiction is appropriate pursuant to three specific provisions--735 Ill. Comp. Stat. 5/2-209(a)(1), (7), and (10) due to Defendants' "transaction of any business" in Illinois (Defendants' active membership in an Illinois-based co-op and purchasing hundreds of millions of dollars of merchandise from it); Defendants' "making or performance of any contract or promise substantially connected" with Illinois (i.e., the numerous Membership Agreements, promises to pay, and subscriptions for stock in an Illinois-based co-op) and under the "acquisition of ownership, possession or control of any asset or thing of value" clause (its ownership of millions of dollars of stock in an Illinois-based company).

even if they never agreed to Illinois venue, they are still subject to Illinois' jurisdiction based on their intimate relationship with an Illinois based co-op for the past quarter century.

Courts have found that personal jurisdiction exists in similar co-op membership cases. In *TruServ Corp. v. ST Yards, Inc.*, 2001 WL 743642 (N. D. Ill. 2001), the plaintiff was an Illinois buying co-op and, like Ace, its members owned its stock and received its profits. The Court noted that even if it were to "ignore" a forum selection clause, minimum contacts based existed based upon the co-op membership:

> It is clear from the relationship of the parties that TruServ is an Illinois-based cooperative. Specifically, the credit relationships between TruServ and Economy were ultimately governed through TruServ's Credit Services Department in Chicago, Illinois. *** TruServ's buyers of merchandise and services are located in Illinois, members' orders are coordinated in Illinois and then relayed to its Regional Distribution Centers, members accounts are coordinated and updated in Illinois and TruServ's national advertising program is coordinated in Illinois.

*Id.* at *5. Since the *TruServ* defendants were "receiving all the benefits and privileges of an Illinois centralized operation and incurring all of the debt claimed due and owing in [that] case", personal jurisdiction was proper.

Likewise, in *Servistar Corp. v. The Home Hardware Co.*, 96 B.R. 593 (W. D. Penn. 1989), a Pennsylvania co-op brought a breach of contract action against an Illinois member store. The defendant sought dismissal on personal jurisdiction grounds and sought a *forum non conveniens* transfer. Like Ace, Servistar purchased hardware in bulk and supplied it to members. There was no indication that the defendants contractually agreed to venue and the defendants had never been to Pennsylvania, never conducted business or made sales there, and did not go there to negotiate contracts or conduct business. In finding that personal jurisdiction existed in the co-op's home state, the Court pointed out that the co-op suffered harm there because it was not paid.

In analogizing the case to the Supreme Court's *Burger King* decision, and in addressing many of

the arguments that Defendants in this case have made, the Court noted that:

> …defendants applied for membership in plaintiff's Pennsylvania based co-op and enjoyed the benefits of this national organization. Although defendants never ventured to Pennsylvania in the course of their relationship with plaintiff, they did initiate numerous letters and phone calls directed to plaintiff in Pennsylvania, both in negotiating the agreements and in conducting business under them. As a result of their affiliation with plaintiff, defendants were entitled to use the Servistar name and trademark. Defendants were required to make payments to a Pennsylvania bank and their failure to make payments caused a loss to a Pennsylvania corporation. Finally, the Retail Agreements specify that they were formed in Pennsylvania and are governed by Pennsylvania law.
>
> Defendants' contention that they ordinarily dealt through a Servistar representative located in Illinois is also addressed by the Court in *Burger King.* There defendants dealt with a regional office in Michigan and claimed surprise at being subjected to suit in Florida. But the Court noted that defendants did in fact deal directly with the Florida headquarters, particularly in negotiating the original agreement and in arguing disputed issues which arose in the course of business.

As such, the court found that personal jurisdiction was appropriate in the co-op's home state.

*See also CCA Global Prsp., Inc. v. Yates Carpet, Inc.*, 2005 WL 2406018 (E.D. Miss. 2005);

*vacated on other grounds* 2005 WL 2671335 (rejecting retailer's argument that Missouri court

lacked personal jurisdiction and venue was improper since it was a member of a co-op based in

Missouri and, among other things, paid a membership fee and had the right to use the co-op's

registered marks *and despite that the parties' expressly removed a forum selection clause*).[5]

Finally, in *Ace Hardware Corp. v. Celebration Ace Hardware, LLC, et al*., 2009-cv-

00066, Chief Judge Holderman considered a personal jurisdiction challenge by an Ace guarantor

whose guaranty had no venue provision.  (*See*, Exhibit 3)  The guaranty in that case was similar

---

[5] *See also Drayton Grain Processors v. NE Foods, Inc.*, 2007 WL 983825 (D.N.D. Mar. 30, 2007) (North Dakota-based co-op for production of frozen dough established personal jurisdiction over individual who produced frozen dough and had invested in co-op through separate entity); *Nat. Fire Ins. Co. of Hartford v. Nat. Cable TV Co-op., Inc.*, 2011 WL 1430332 (D. Kan. 2011) (potential co-op member that submitted membership application and otherwise communicated with co-op in the forum state purposely directed its activities to the forum state for purposes of personal jurisdiction).

to the one that the Defendant-related entities signed.  (Exhibit 1 at ¶ 13(b)).  The Court ruled that personal jurisdiction existed based on the guarantor's knowledge that Ace was located in Illinois and that payments would be sent here in the event of default.   (Exhibit 3 at p. 3)

Defendants have "minimum contacts" with Illinois based on their lengthy Ace co-op membership, including the fact that they owned millions of dollars in Ace stock, paid for hundreds of millions of dollars in merchandise into Illinois, received millions of dollars in patronage dividends from Illinois, benefited from the advertising and other services that took place in Illinois, were extended millions of dollars in credit based on decisions made in Illinois, and otherwise came to be associated with an Illinois-based organization.   (Exhibit 1 at ¶¶ 2-30) As such, there is personal jurisdiction over Defendants in Illinois.

### 3.    Defendants Consented To Illinois Venue

Defendants characterize the venue clause in the Membership Agreements as permissive, "not self-executing" and, therefore, insufficient to establish personal jurisdiction.  (Memo, pp. 4-6)  Defendants are correct to the extent that they assert the contractual language is permissive. Nevertheless, as set forth above, Defendants' relationship with an Illinois-based co-op subjects it to personal jurisdiction regardless of the parties' contractual agreement.  *See*, *e.g.*, *TruServ.*

In addition, permissively consenting to Illinois venue provides <u>more</u> support for a finding of personal jurisdiction.  Defendants agreeing on eleven occasions that they "consent[ed] and agree[ed]" that Ace "may" bring suit against it in Illinois constitutes an express consent to jurisdiction.  *See NW. Nat. Ins. Co. v. Donovan*, 916 F.2d 372, 374, 378 (7th Cir. 1990)(venue provision, granting one party option to litigate in particular forum, prohibits objections because "one who has agreed to be sued in the forum selected by the plaintiff has thereby agreed not to seek to retract his agreement by asking for a change of venue on the basis of costs or

inconvenience to himself; such an effort would violate the duty of good faith that modern law reads into contractual undertakings"); *Am. Roller Coast. Co. LLC v. Foster Adams Leasing, LLP*, 421 F.Supp.2d 1109, 1113 (N. D. Ill. 2006)(fact that contract allowed venue in either South Carolina or Illinois and thus was permissive "does not make a difference" because defendant consented to venue in Illinois); *see also, John Boutari and Son v. Attiki Importers*, 22 F. 3d 51, 53 (2d Cir. 1994(reversing dismissal for lack of personal jurisdiction based on permissive forum clause). As Defendants "consented" to being sued in Illinois, they cannot reasonably make an argument that they could not have expected to "being haled into court there."

### 4.    Puerto Rico Law Does Not Prohibit This Action From Proceeding In Illinois.

Defendants argue (Memo, pp. 6-11) that assuming the venue clauses are "mandatory", Puerto Rico Law 75 would make them "not enforceable on [their] face." This argument can be rejected for the following reasons:

*First*, and as set forth above, the parties agree that the applicable venue language is not "mandatory" and therefore this undermines the basis for Defendants' argument.

*Second*, and related, Law 75's plain language only applies to "[a]ny stipulation that obligates a dealer to adjust, arbitrate or litigate . . . outside of Puerto Rico." 10 P.R. Laws Ann. § 278(b-2) (emphasis added). "Obligate" is defined, in part, as to "require" or "to bind or contrain". [6] The Membership Agreements' clauses provide that Ace "may" bring suit in Illinois--not that all suits "shall" or "must" be brought in Illinois; and they do not address where Defendants must bring suit. As such, their argument fails. *See,* 10 P.R. Laws Ann. § 278(b-2).

*Third*, and again assuming the contractual language was mandatory (which all parties agree is not the case), contracting to allow Ace to file a lawsuit in Illinois is not "prohibited by

---

[6] *See* Black's Law Dictionary, Fifth Edition; *see also*, http://thesaurus.com/browse/obligate

the laws of the jurisdiction in which the member location is situated". In fact, Puerto Rico courts routinely transfer Law 75 cases to other jurisdiction. *See generally*, *Antilles Cement Corp. v. Aalborg Portland A/S*, 526 F.Supp.2d 205 (D.P.R. 2007)(rejecting argument that Law 75 cases must be heard in Puerto Rico and enforcing Danish forum selection clause); *BMJ Foods P.R, Inc. v. Metromedia Steakhouses Co., L.P.*, 562 F. Supp.2d 229, 232 (D.P.R. 2008)(despite no forum selection clause, where franchisor first filed in Texas to collect money and franchisee then filed Law 75 claim in Puerto Rico, the case was transferred to Texas); *Diaz-Rosado Perfect Shine v. Auto Wax Company, Inc.*, 2005 WL 2138794, 04-2296 (D.P.R. Aug. 26, 2005) transferring Law 75 case to Texas); *Maxon Eng'g Servs., Inc. v. U.S. Sci., Inc.*, 34 F. Supp.2d 97, 100 (D.P.R. 1989) (transferring Law 75 case to Pennsylvania); *Marel Corp. v. ENCAD Inc.*, 178 F. Supp.2d 56, 59 (D.P.R. 2001)(holding that Puerto Rico's public policy, as stated in Act 75, cannot avoid transfer of venue; case transferred to California); *Puerto Rico Sur. Tech, Inc. v. Applied Med. Dist. Corp.*, 2010 WL 4237927, *3 (D.P.R. Oct 26, 2010); *Royal Bed and Spring Co. v. Famossul Industria e Comercia de Moveis Ltda.*, 906 F.2d 45 (1st Cir. 1990)(affirming transfer of Law 75 case from Puerto Rico to foreign country). [7] As such, personal jurisdiction exists over Defendants in Illinois.

## II.     THIS CASE SHOULD NOT BE RESOLVED IN PUERTO RICO.

In a three-sentence argument (Memo, pp. 14-15), and without citing any law whatsoever, Defendants argue that this action should be heard in Puerto Rico because they filed a lawsuit

---

[7] Defendants rely upon two cases that pre-date the many cases transferring Law 75 cases outside of Puerto Rico. In fact, in *Medika Intern., Inc. v. Scanlan Intern., Inc.*, 830 F. Supp. 81 (D.P.R. 1993), the Court discussed *Pan American Comp. Corp. v. Data Gen. Corp.*, 467 F.Supp.969 (D.P.R. 1979) and held that the "viability" of the case law it relied upon "is seriously in question." *Id.* at 87.

there on July 14, 2011, <u>nearly a quarter year after Ace filed this lawsuit in DuPage County,</u> <u>Illinois</u>. Defendants then request a transfer pursuant to 28 USC § 1404. (*Id*. at pp. 15-19)

Defendants' three-sentence argument should be rejected because it is completely unsupported by any authority whatsoever and is contrary to deference provided to first-filed actions. *See generally*, *Aguakem Caribe, Inc. v. Kemiron Atlantic, Inc.*, 218 F. Supp. 2d 199, 203 (D.P.R. 2002)(in transferring franchisee's Law 75 claim out of Puerto Rico due to earlier filing elsewhere by franchisor, court noted that case law "strongly favor[s]" the forum where suit was first-filed); *BMJ Foods Puerto Rico, Inc.*, 562 F. Supp.2d at 232 (D.P.R. 2008)(transferring Law 75 case to Texas where franchisor had first filed); *Outek Carib. Dist., Inc. v. Echo, Inc.*, 206 F.Supp.2d 263, 270 (D.P.R. 2002)(in transferring Law 75 lawsuit to Illinois, court noted that the impact of Law 75's public policy is not significant, "to the extent that it is even a factor at all").[8]

Defendants' next request, for a *forum non conveniens* transfer, should also be denied as it is entirely unsupported. 28 USC. § 1404(a) provides, "For the convenience of the parties and witnesses, and in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." [9] As the moving parties, Defendants have the burden of showing that the transferee forum is "clearly more convenient", *Coffey v. Van*

---

[8] Ace will be filing a Motion in Puerto Rico asking that the later filed action be transferred here.

[9] Defendants argue that the *M/S Breman v. Zapata Off-Short Co.*, 407 U.S. 1 (1972) is inapplicable under the Seventh Circuit's reasoning in *AAR Intern., Inc. v. Nimelias Enterprises S.A.*, 250 F.3d 510 (7th Cir. 2001). Notably, here Defendants "consented" and "agreed" to be sued in Illinois. While the Membership Agreements' language is not as strong as in *AAR Intern.*, Defendants certainly consented to being sued in Illinois and therefore should not now be heard to complain that litigating here is not convenient. *See generally*, *NW Nat. Ins. Co. v. Donovan*, 916 F.2d 372, 374, 378 (7th Cir. 1990)(venue provision, granting one party an option to litigate in a particular forum, serves to prohibit the other party from objecting to venue in that forum); *Am. Roller Coaster Co. LLC v. Foster Adams Leasing, LLP*, 421 F.Supp.2d 1109 (N.D. Ill. 2006). Nevertheless, because under either standard, a transfer is not appropriate, Ace has analyzed the transfer under the more lenient Section 1404.

*Dorn Iron Works*, 796 F.2d 217, 219-220 (7th Cir. 1986), and must reference particular circumstances justifying a transfer. *First Nat'l Bank v. E Camino Res.Ltd.*, 447 F.Supp. 2d 902, 913 (N.D. Ill. 2006). [10]

Defendants' Motion must be summarily rejected for failing to offer competent evidence about how it would be inconvenient or difficult for Defendants to litigate in Illinois. "A defendant moving for transfer must show that the original forum is inconvenient for it". *Mullins v. Equifax Inf. Serv., LLC*, 2006 WL 1214024 (E.D. Va. 2006)(emphasis added); *citing* 15 Wright, Miller & Cooper § 3849; *Landis v. Warner Chilcott (US), LLC*, 2010 WL 5373664 (N.D. Ill. 2010)(emphasis added) ("It must be shown that the original forum is inconvenient for the defendant and that the alternative forum does not significantly inconvenience the plaintiff.").[11] As Defendants offer no evidence that litigating in Illinois is inconvenient for them (or that it will not inconvenience Ace to litigate in Puerto Rico), its request must be rejected. *See, Coffey*, 796 F.2d at 219-220. Nevertheless, even if the Court considers the *forum non conveniens* factors, the Defendants fail to establish that Puerto Rico is a clearly more convenient forum:

A.  **PRIVATE INTEREST FACTORS:**

1.  **Ace's Choice Of This Forum Is Entitled To Substantial Weight:** Ace is a co-op headquartered here, has its witnesses here, and at least a substantial part of the dispute

---

[10] As Defendants point out, in evaluating convenience, factors a court should consider include "private" factors such as: (1) the plaintiff's choice of forum; (2) the situs of material events; (3) the relative ease of access to sources of proof; (4) the convenience of the witnesses; and (5) the convenience of the parties of pursuing the case in either forum. The "public" factors include the court's familiarity with the applicable law, speed to trial, and the benefits of resolving disputes locally. *Hinc v. Lime-O-Sol Co.*, 231 F.Supp.2d 795, 796 (N.D. Ill. 2002).

[11] Defendants cannot, of course, add new facts in their reply brief. *Casio Comp. Co. v. Noren*, 2001 WL 893813 * 4 (N.D. Ill. Aug. 6, 2001)(it is "inappropriate to rely on factual assertions… raised for the first time in a reply brief"); *Mayoral v. Sheanhan*, 1998 WL 381699 * 3, 96 c 7249 (N.D. Ill. 1998).

between the parties arose here. Courts have made clear that, "[t]he plaintiff's choice of forum is entitled to <u>substantial weight</u> under § 1404(a), especially if it is also the plaintiff's home forum." *Pava v. Drom Intera., Inc.*, 8 F.Supp.2d 1062, 1064 (N.D. Ill. 1998)(emphasis added); *United Airlines v. Messa Airlines, Inc.*, 8 F.Supp.2d 796, 798 (N.D. Ill. 1998). "Indeed, the balance must weigh strongly in the defendant's favor before a plaintiff's choice of forum will be disturbed." *Id.* at 1064-65: *United Airlines,* 8 F.Supp.2d at 798.

Case law further establishes that litigating a dispute in a co-op's location is appropriate. *Servistar Corp.,* 96 B.R. 593 (W.D. Penn., Feb. 14, 1989)(denying *forum non conveniens* motion in lawsuit brought in co-op's state); *Chimney Rock Public Power Dist. v. Tri-State Gen. & Trans. Ass'n, Inc.*, 2010 WL 3328262 (D. Neb. July 13, 2010)(granting *forum non conveniens* motion where members/owners of Colorado co-op sued in Nebraska despite the fact that plaintiffs were from Nebraska and defendant was registered to do business there, meetings took place in Nebraska, and contracts were sent to Nebraska). This factor does not favor a transfer.

2. **Situs Of Material Events:** This is a collection action. The "material" event here is lack of payment, the injury for which occurred in Illinois. *Servistar Corp.*, 96 B.R. at 593 (injury for non-payment to co-op is felt in its home state). The stock Defendants wanted to use to offset obligations is stock in an Illinois-based co-op, the relationship with Defendants and other co-op members is administered in Illinois (including the credit determinations and the relevant Ace International operations), Defendants consented to be sued here, and they made false promises of payment to Illinois employees.

3. **Sources Of Proof And Convenience To Parties And Witnesses:**

*Witnesses:* Defendants have put forth <u>no</u> evidence whatsoever about its witnesses other than Angel Garcia, who lives and works in Illinois. This basis, therefore, cannot favor Puerto

Rico. *Heller Fin., Inc. v. Mid. Powder Co. Inc.*, 883 F.2d 1286,1293 (7th Cir.1989); *Metzger v. SleeceCo, Inc.*, 2010 WL 563073, 2009 cv 6071 (N.D. Ill. 2009) ("The party requesting the transfer has the burden of demonstrating who its witnesses are, the nature of their testimony, and how important that testimony will be to the case."). The moving party must also show that "the testimony of these particular witnesses is necessary to his case." *First Nat. Bank*, 447 F. Supp. 2d at 913.

On the other hand, Ace has set forth twelve Illinois-based witnesses who have relevant knowledge (many are identified by name in Defendants' Puerto Rico complaint) and all reside in Illinois. (Exhibit 1 at ¶22) Three of these witnesses are non-party witnesses over whom Ace has no control and for whom appearance at trial in Puerto Rico could not be compelled. *Id.*

*Documents:* Ace's documents are located in Illinois. (Exhibit 1 at ¶33) Defendants' documents can be easily transferred here. *RR Donnelley & Sons Co. v. Hays Intern. Markt. Ser., Inc.*, 1999 WL 284798 * 6 (N.D. Ill. Apr. 26, 1999)(in light of modern advancement, moving documents from one location to another does not warrant transfer).

**B.    PUBLIC INTERESTS FACTORS DO NOT FAVOR A TRANSFER.**

**1.    Relation Of Locale To The Controversy:** Significant contract negotiations occurred here, the impact of the breach occurred in Illinois, Ace has its principal place of business here, and Defendants were a major member of an Illinois based co-op. These factors, therefore, weigh against a transfer. *RR Donnelley* at * 6 (N.D. Ill. Apr. 26, 1999)(Illinois has a strong interest in hearing contractual disputes involving Illinois residents); *Metzger*, 2010 WL 563073 at *4 (Illinois has an interest adjudicating payment disputes for its residents).

**2.    Speed Of Proceeding:** Defendants offer no evidence on this factor. Ace requests the Court take Judicial Notice that the median number of months for "filing to disposition" of

civil cases in the Northern District of Illinois is 6.2 months versus 11.3 months in Puerto Rico. [12] This factor, therefore, weighs against transfer.

**3.** __Court's Familiarity With Law:__  The Membership Agreements and Corporate Guaranty call for Illinois law.  Accordingly, this factor favors Illinois.  To the extent that Puerto Rico law applies, this still does not favor a transfer.  *See*, *BMJ Foods, P.R., Inc.*, 562 F. Supp.2d at 232 ("this court has found in the past that transferee courts are fully capable of resolving claims brought under Act 75 pursuant to Puerto Rico law."); *RR Donnelley* at * 6 (because federal court's routinely apply other laws, the potential application of a different law does not favor transfer); *Diaz-Rosado*, 2005 WL 21388794 * 4 (D.P.R. 2005)(in transferring Law 75 case to Texas, court noted that other jurisdictions can apply Puerto Rico's law).

Accordingly, Defendants have not met their burden of showing that Puerto Rico is a clearly more convenient forum.

## CONCLUSION

WHEREFORE, Ace respectfully request that Defendants' Motion To Dismiss be denied.

Dated: August 24, 2011

Respectfully submitted,

**ACE HARDWARE CORPORATION**

By:    /s/ David J. Fish
        One of its Attorneys

David J. Fish
THE FISH LAW FIRM, P.C.
1770 N. Park Street, Suite 202
Naperville, IL 60563
(630) 355-7590

---

[12] http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2010/appendices/C05Sep10.pdf