**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ACE HARDWARE INTERNATIONAL HOLDINGS, LTD. as assignee of ACE HARDWARE CORPORATION, | ) ) ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | No. 11-cv-3928 |
| v. | ) | |
| | ) | |
| MASSO EXPO CORP. and CAGUAS LUMBER YARD, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendants Massó Expo Corporation and Caguas Lumber Yard, Inc.'s Motion to Dismiss the Verified Complaint for Lack of Personal Jurisdiction or, in the Alternative, to Transfer the Action.[1] For the following reasons, the Court denies Defendants' motion.

**BACKGROUND**

**I.     The Parties**

Plaintiff Ace International Holdings Ltd. ("Ace International"), is a foreign corporation organized under the laws of Bermuda.  (R. 1-1, Compl. ¶ 2.)  Ace International is a subsidiary of Ace Hardware Corporation ("Ace Hardware"), a Delaware corporation having its principal place

---

[1] Defendants' Memorandum of Law in support of its Motion to Dismiss indicates, on the first page, that Defendants seek to dismiss the Complaint under Rule 12(b)(3) as well as Rule 12(b)(2).  Defendants, however, do not make any substantive Rule 12(b)(3) arguments in their Memorandum of Law.  Accordingly, the Court will not construe Defendants' motion as one for dismissal under Rule 12(b)(3).

of business in Oak Brook, Illinois.  (*Id.*)  Ace Hardware currently acts as the billing and collection agent for Ace International.  (*Id.*)

Defendants Massó Expo Corporation ("Massó") and Caguas Lumber Yard, Inc. ("Caguas") are corporations organized under the laws of the Commonwealth of Puerto Rico, and they currently own and operate several retail hardware stores there.  (*Id.* ¶ 3; R. 19-1, Massó Decl. ¶ 3.)[2]  Defendants entered into a series of Ace Hardware Membership Agreements ("Membership Agreements") with Ace Hardware, which Plaintiffs attached to the Complaint as Exhibits A and B.  (*Id.*)

On or about January 2, 2011, Defendants became shareholders in Ace International. (Compl. ¶ 4.)  At that time, Ace Hardware, Ace International and Defendants entered into a series of Assignment and Amendment Agreements ("Assignment Agreements"), which Plaintiffs attached to the Complaint as Exhibits C and D.  (*Id.*)  Pursuant to the Assignment Agreements, Ace Hardware transferred its rights and obligations under the Membership Agreements to Ace International.  (*Id.*)  Among the rights transferred was the right to all accounts receivable that Defendants allegedly owe to Ace Hardware.  (*Id.*)  Ace International retailers currently purchase merchandise from Ace Hardware and continue to receive most of the benefits of Ace Hardware's co-op, but they no longer own shares of Ace Hardware.  (R. 36-2, Ting Decl. ¶ 7.[3])

Plaintiff sued Defendants on April 28, 2011 in the Circuit Court of the Eighteenth Judicial Circuit, DuPage County, Illinois alleging that Defendants breached the Membership

---

[2]  Gildo Massó, the President of Defendants, submitted an affidavit in support of Defendants' motion to dismiss.

[3]  Pete Ting, Ace Hardware's Vice President of International Finance, submitted an affidavit in connection with Plaintiff's response to Defendants' motion.

Agreements by failing to pay for merchandise, supplies, and services it received from Ace Hardware. (Compl. ¶¶ 6-19.) Although Ace International was not initially a party to the Membership Agreements, it assumed the right to collect Ace Hardware's alleged obligations from Defendants and therefore is the Plaintiff in this case. (*Id.* ¶¶ 20-21.) On June 9, 2011, Defendants removed the case to federal court. (R. 1, Notice of Removal.)

## II.     Ace Hardware's Corporate Structure

Ace Hardware operates as a cooperative that purchases merchandise in bulk and allows its individual members to purchase merchandise in smaller quantities to save money. (Ting Decl. ¶ 3.) Ace is wholly-owned by its independently-operated store owners. (*Id.* ¶ 4.) No shares of Ace Hardware's stock are publicly-traded. (*Id.*) When a retailer affiliates with Ace Hardware, it purchases shares of company stock and receives voting rights in the cooperative. (*Id.*) Ace Hardware's Board of Directors has between nine and twelve director positions, and a minimum of eight of the directors are Ace Hardware retailers. (*Id.* ¶ 5.) Ace Hardware has held annual meetings in Illinois, in accordance with its by-laws. (*Id.* ¶ 13(c)).

Ace Hardware's world-wide headquarters are located in Oak Brook, Illinois. (*Id.* ¶ 6.) Ace also has an office in Woodridge, Illinois, a warehouse in Princeton, Illinois, and paint plants in Matteson, Illinois and Chicago Heights, Illinois**.** (*Id.*)

## III.     Defendants' Relationship with Ace Hardware and Contacts with Illinois

In 1987, Caguas had its first contact with Ace Hardware at a trade show in St. Louis, Missouri, after which it executed its first Membership Agreement with Ace Hardware. (Massó Decl. ¶ 4.) Since that time, Defendants have executed several Membership Agreements with Ace Hardware. (*Id.*) Defendants became Ace Hardware's sole and exclusive distributors of Ace

products in Puerto Rico.  (*Id.*)

When Defendants decided to open a new store, they submitted to Ace Hardware in Illinois a written application for membership.  (Ting Decl. ¶ 12 and Attachment C.)  All negotiations between Ace Hardware and Defendants related to the Membership Agreements occurred in Puerto Rico.  (Massó Decl. ¶ 5.)  Defendants signed the Membership Agreements in Puerto Rico.  (*Id.* ¶ 6.)  Ace Hardware signed some of the agreements in Puerto Rico, and at other times it signed them in counterparts by have the agreement delivered to it in Illinois.  (*Id.*)

The Membership Agreements provide as follows:[4]

...the Dealer [Massó] shall be deemed to have consented and agreed that:

(a) all provisions of this Agreement shall be interpreted and construed in accordance with the laws of Illinois; and

(b) any suit brought by the Company [Ace] against [Massó] to enforce any provision of this Agreement or seeking any relief in connection with or arising out of the relationship between [Ace] and [Massó] may be instituted in an appropriate court in the state of Illinois unless institution of such suit in Illinois is prohibited by the laws of the jurisdiction in which the licensed location is located.

*See, e.g.*, Compl. at Exhibit A, Membership Agreement between Caguas Lumber Yard, Inc. and Ace Hardware.  Caguas signed a Guaranty of Credit, guaranteeing Massó's financial obligations to Ace Hardware, which was addressed to Ace Hardware in Illinois.  (Ting Dec. ¶ 13(b) and Attachment F.)

When a new retailer first joins the cooperative and when it opens a new store, it signs a subscription agreement with Ace Hardware to purchase a certain number of shares of Ace

---

[4]  The Membership Agreements at issue here all contained this provision, and therefore the differences between the Membership Agreements, if any, are not discussed in this Opinion and Order.

4

Hardware's stock.  (Ting Decl. ¶ 10.)  Ace Hardware administers "all aspects" of its stock from

Illinois.  (*Id*.)  Ace Hardware's tax, accounting, and treasury departments in Illinois oversee Ace

Hardware's stock.  (*Id*.)  During 2010, Defendants owned more than two million dollars' worth

of Ace Hardware's stock.  (*Id.* ¶ 8.)  At some point before 2010, Defendants sold several of their

stores to Home Depot, and Ace Hardware redeemed approximately $1,587,208 in Ace Hardware

stock from Defendants.  (*Id*.)  Pursuant to the subscription agreements between Ace Hardware

and Defendants, Defendants agreed to pay the stock price "at the principal office of Ace

Hardware Corporation located at 2200 Kensington Court, Oak Brook, Illinois."  (*Id.* ¶ 10 and

Exhibit A.)  In addition, the subscription agreements state that they were agreed to in "Oak

Brook, Illinois."  (*Id*.)

Defendants incurred more than 99 percent of their outstanding balance at issue in the

Complaint with Ace Hardware.  (Ting Decl. ¶ 7.)  The Membership Agreement provides that

"[a]ll orders for merchandise, supplies and services placed by [Defendant] pursuant to this

Agreement shall be transmitted to [Ace Hardware] at [its principal office in Illinois]."  (*Id*.

(citing Membership Agreement at Article V, Section I).)

It is undisputed that Defendants purchased "millions of dollars" in paint directly from

Ace Hardware's paint plant in Illinois, and Ace Hardware provided private-labeled Massó brand

paint for Defendants.  (Ting Decl. ¶ 14.)  Defendants ordered millions of dollars in merchandise

each year from Ace Hardware, and these orders were transmitted to Illinois.  (*Id*.)  According to

Plaintiff, Defendants typically purchase merchandise in one of two ways: 1) directly from Ace's

domestic warehouse; or 2) ordering product directly from vendors (e.g., "drop ship orders).

(Ting Decl. ¶ 13(d).)  According to Plaintiff, Defendants' merchandise orders come through

"ACENET," which is an electronic computer system administered in Illinois.  (*Id.* ¶ 14.)  With a drop ship order, the vendor ships the product directly to Defendants, but submits the bill to Ace Hardware in Illinois.  (*Id.*)  Defendants, on the other hand, state that they currently order and receive products from Ace Hardware's plant in Loxley, Alabama and that they previously ordered and received products from Ace Hardware's distribution center in Tampa, Florida.  (Massó Decl. ¶ 7 and Attachment 1.[5])  Plaintiff agrees that the actual merchandise Defendants receive is physically shipped from a warehouse outside of Illinois, but states that the shipments are only made once Ace Hardware's employees in Illinois authorize them.  (Ting Decl. ¶ 14.)  All inventory management and replenishment occurs in Illinois.  (*Id.*)

Ace Hardware provided retail support to Defendants from its regional offices in Florida.  (Massó Decl. ¶ 8 and Attachment 2.)  During 1997 and 1998, Ace Hardware assigned Mr. Angel Garcia as Ace Hardware's representative and support contact for Massó's operations.  (*Id.* ¶ 10.)  Mr. Garcia resided in Puerto Rico during that time.  (*Id.*)  At other times, Ace Hardware assigned its regional managers working out of Miami, Florida to Puerto Rico.  These regional managers periodically visited Puerto Rico and directly gave support to Massó's retail operations there.  (*Id.* ¶ 13.)

Ace Hardware customarily provided training programs for Massó's personnel.  (Massó Decl. ¶ 14.)  Defendants aver that "substantially all" of those seminars took place in Puerto Rico or in cities outside of Illinois.  (*Id.* and Attachment 4.)  It is undisputed that Defendants' representatives attended at least two Ace Hardware training programs in Illinois–one in July

---

[5]  Attachment 1 to Massó's declaration contains bills of lading that identify the sender as "Ace Hardware Corporation" located at 29891 Highway #59, Loxley, Alabama, 36551.

2005 and one in September 2007.  (Ting Decl. ¶ 25.)

Defendants received substantial profits from Ace Hardware in the form of "patronage dividends."  (Ting Decl. ¶ 11.)  Patronage dividends consist of Ace Hardware stock, interest-bearing notes ("Patronage Certificates"), and cash.  (*Id*.)  The amount Ace Hardware paid to each retailer is based upon the amount of merchandise the retailer purchases through Ace Hardware during the year prior.  (*Id*.)  The Patronage Certificates are identified as being issued in Oak Brook, Illinois, and they bear the signature of two Ace Hardware officers, both of whom work in Illinois.  (*Id.*)  Defendants currently have $188,984.59 in outstanding Patronage Certificates. (*Id.*)  Ace Hardware's Illinois offices manage everything related to Defendants' Patronage Certificates.  (*Id*.)

Ace Hardware employees conducted weekly and monthly meetings in Illinois regarding how much Defendants could order on credit with Ace Hardware given Defendants' financial problems.  (Ting Decl. ¶ 15.)  Ace Hardware employees in Illinois performed credit checks on Defendants in Illinois.  (*Id*.)  Ace Hardware prints billing statements in Illinois and sends them to Defendants in Puerto Rico.  (*Id.* ¶ 17.)

Defendants utilized Ace Hardware's "ACENET" system, which allows its members to obtain benefits, such as vendor directories, co-op manuals, ordering, material safety data sheets, and product and service information, via the Internet.  (*Id.* ¶ 16.)  Ace Hardware provided Defendants with money from its Illinois-administered cooperative advertising fund.  (*Id.* ¶ 19.) Ace Hardware's advertising department is located in Illinois.  (*Id.*)  The Membership Agreements required that Defendants pay a portion of charges for national and regional advertising programs.  (*Id.*)

In August 2010, Defendants submitted to Ace Hardware in Illinois a Debt Elimination Plan, outlining how they intended to pay off the outstanding balance they owed to Ace Hardware. (*Id.* ¶ 34.) Defendants and Ace Hardware in Illinois had discussions thereafter regarding Defendants' payment plan. (*Id.* ¶ 35.)

## IV. The Puerto Rico Action

On July 14, 2011, Defendants, along with several other affiliated Puerto Rican corporations, filed a lawsuit against Ace Hardware and Ace International for alleged violations of 10 P.R. Laws Ann. § 278 et seq. ("Law 75"), breach of contract, annulment of contract, breach of fiduciary duty and the covenant of good faith and fair dealing. (R. 19-2, Complaint in Case No. 11-cv-1684.) In that lawsuit, Defendants argue that Plaintiff and Ace Hardware terminated their contracts without just cause, and they request the court to annul subscription agreements, the Assignment Agreements and certain other documents. They further claim that Ace Hardware and Ace International, through intimidation and coercion, forced them to sign those documents.

## LEGAL STANDARD

## I. Rule 12(b)(2)

A motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) tests whether a federal court has personal jurisdiction over a defendant. *See* Fed.R.Civ.P. 12(b)(2); *Central States v. Phencorp Reins. Co.*, 440 F.3d 870, 875 (7th Cir. 2006). In ruling on a Rule 12(b)(2) motion, courts may consider matters outside of the pleadings. *See Purdue Research Found. v. Sanofi-Sythlabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When a court determines a Rule 12(b)(2) motion based on the submission of written materials without holding an

8

evidentiary hearing, the plaintiff must make a *prima facie* case of personal jurisdiction. *See uBID, Inc. v. GoDaddy Grp., Inc*., 623 F.3d 421, 423-24 (7th Cir. 2010); *GCIU-Emp'r Ret. Fund v. Goldfarb Corp*., 565 F.3d 1018, 1023 (7th Cir. 2009). As such, the plaintiff bears the burden of establishing that personal jurisdiction exists. *See uBID, Inc.*, 623 F.3d at 423-24; *GCIU-Emp'r Ret.*, 565 F.3d at 1023. In determining whether the plaintiff has met its burden, a court must resolve all factual disputes in the plaintiff's favor. *See GCIU-Emp'r Ret. Fund*, 565 F.3d at 1020 n.1. Courts will, however, accept as true any facts contained in the defendant's affidavits that the plaintiff does not refute. *Id.*; *see also Purdue Research Found*., 338 F.3d at 783 (if the defendant submits affidavits or other evidence in opposition to the plaintiff's motion, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction").

When, as here, the Court's subject matter jurisdiction is based on diversity of citizenship, the Court may exercise personal jurisdiction over a defendant only if personal jurisdiction would be proper in an Illinois court. *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). "A state's exercise of personal jurisdiction is also subject to the demands of the Fourteenth Amendment's due process clause. Because Illinois permits personal jurisdiction if it would be authorized by either the Illinois Constitution or the United States Constitution, the state statutory and federal constitutional requirements merge." *uBID, Inc.*, 623 F.3d at 425 (citing *State of Illinois v. Hemi Group LLC*, 622 F.3d 754, 756-57 (7th Cir. 2010) and *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010)); *see also Philos Techs., Inc. v. Philos & D, Inc*., 645 F.3d 851, 855, n.2 (7th Cir. 2011).

It is well-established that the due process test for personal jurisdiction requires that a

defendant have minimum contacts with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quotations and citations omitted); *uBid*, *Inc*., 623 F.3d at 425 (citation omitted).  There are two types of personal jurisdiction: general and specific.  *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *uBid, Inc.*, 623 F.3d at 425.  "General jurisdiction is for suits neither arising out of nor related to the defendant's contacts with the State, and is permitted only where the defendant conducts continuous and systematic general business within the forum state." *GCIU-Emp'r Ret*., 565 F.3d at 1023; *see also Helicopteros*, 466 U.S. at 416.  Specific jurisdiction is narrower and "refers to jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *GCIU-Emp'r Ret*., 565 F.3d at 1023.

## II.      28 U.S.C. § 1404(a)

Pursuant to 28 U.S.C. § 1404(a), a district court may transfer a civil action "for the convenience of the parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought."  A transfer under § 1404(a) is appropriate if "(1) venue is proper in both the transferor and transferee court; (2) transfer is for the convenience of the parties and witnesses; and (3) transfer is in the interests of justice."  As the moving party, Defendants bear the burden of establishing these three factors.  *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-220 (7th Cir. 1986); *see also Tri3 Enters., LLC v. Aetna, Inc*., No. 11 C 3253, 2011 WL 2550736 (N.D. Ill. June 24, 2011).  A district court has discretion to decide motions to transfer venue according to a "case-by-case consideration of convenience and fairness."

*Research Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 977 (7th Cir. 2010)

(citing *Stewart Org. Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d. 22

(1988)).

## ANALYSIS

Plaintiff argues that the Court has personal jurisdiction over Defendants because of their

ownership interest and "active membership" in the Ace Hardware co-op, purchase of

merchandise from Ace Hardware in Illinois, and other contacts with Illinois.  Defendants argue

that the Court does not have personal jurisdiction over them, either through a sufficient contacts

analysis or under the forum selection clause in the Membership Agreements.  Specifically,

Defendants argue that 1) the forum selection clause in the Membership Agreements is permissive

and therefore is not "self-executing"; and 2) even if the forum selection clause is mandatory,

Puerto Rico law prohibits its enforcement.  Should the Court deny Defendants' Rule 12(b)(2)

motion, Defendants ask the Court to transfer this action to Puerto Rico, where a lawsuit between

the parties (along with additional parties) is currently pending.

## I.      Forum Selection Clause

A defendant may waive the ability to challenge personal jurisdiction by consenting to an

enforceable forum selection clause.  *See IFC Credit Corp. v. Alian Bros. Gen. Contractors, Inc.*,

437 F.3d 606, 610 (7th Cir. 2006).  In determining whether the defendant waives its ability to

challenge personal jurisdiction on this ground, a district court must decide "(1) whether the

clause in the agreement is, in fact, a forum-selection clause; and if so (2) whether the clause is

enforceable."  *Macey & Aleman v. Simmons*, No. 10-cv-06646, 2011 WL 1456762 (N.D. Ill.

Apr. 14, 2011) (citing *IFC Credit Corp. v. Burton Indus.*, No. 04 C 5906, 2005 WL 1243404, at

*2 (N.D. Ill. May 12, 2005)).  A forum selection clause is one that includes mandatory language indicating "that the parties have selected a particular forum" for disputes arising out of the agreement.  *Id.*  The Membership Agreements contain the following clause:

> ...the Dealer [Massó] shall be deemed to have consented and agreed that:
>
> (b) any suit brought by the Company [Ace] against [Massó] to enforce any provision of this Agreement or seeking any relief in connection with or arising out of the relationship between [Ace] and [Massó] **may** be instituted in an appropriate court in the state of Illinois **unless institution of such suit in Illinois is prohibited by the laws of the jurisdiction in which the licensed location is located**.

*See, e.g.*, Compl. at Exhibit A, Membership Agreement between Caguas Lumber Yard, Inc. and Ace Hardware (emphasis added).

Both parties agree that the clause in the Membership Agreements is a permissive forum selection clause, and therefore it does not automatically bar Defendants from contesting personal jurisdiction in Illinois.  *See* R. 19, Defs' Mem. of Law at 6 and R. 36, Plfs' Resp. at 13.

## II.     Minimum Contacts

### A.     General Jurisdiction

The Seventh Circuit has emphasized that the standard for general jurisdiction is "demanding" and requires the defendant to have such "extensive contacts with the state that it can be treated as present in the state for essentially all purposes."  *uBID*, 623 F.3d at 426.  In determining whether to exercise general jurisdiction over a defendant, courts typically apply a five-part test: (1) whether and to what extent the defendant conducts business in the forum state; (2) whether the defendant maintains an office or employees within the forum state; (3) whether the defendant sends agents into the forum state to conduct business; (4) whether the defendant advertises or solicits business in the forum state; and (5) whether the defendant has designated an

agent for service of process in the forum state. *See Helicopteros*, 466 U.S. at 416; *see also Corus Int'l Trading Ltd., Eregli Dermir Ve Celik Fabrikalari, T.A.S.*, 765 F. Supp.2d 1079, 1083 (N.D. Ill. 2011).

Defendants argue that it is undisputed that there is no general personal jurisdiction over them because they clearly do not have the "continuous and systematic general business contacts" with the forum. (R. 39, Defs.' Reply at 4, n.4 (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1277 (7th Cir. 1997)). Plaintiffs do not argue that the Court has general jurisdiction over Defendants, nor have they alleged or offered facts sufficient to establish that Defendants had "continuous and systematic general business contacts" with Illinois. *See RAR, Inc*., 107 F.3d at 1277 (indicating that a plaintiff waives its general jurisdiction argument when it fails to allege fact in its complaint to show defendants had "systematic contacts with Illinois"). Accordingly, the Court will not analyze whether it has general personal jurisdiction over Defendants.

**B.  Specific Jurisdiction**

"Specific personal jurisdiction is appropriate when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010). A court may exercise specific jurisdiction in cases where a defendant could have anticipated being haled into court in the state in which the court sits. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). "Notably, it must be the activity of the defendant that makes it amenable to jurisdiction, not the unilateral activity of the plaintiff or some other entity." *Purdue Research Found*., 338 F.3d at 787. In deciding whether the Court may exercise specific jurisdiction over Defendants, the Court must identify

their contacts with Illinois, analyze whether those contacts meet constitutional minimums and whether exercising jurisdiction on the basis of the minimum contacts sufficiently comports with fairness and justice, and determine whether the sufficient minimum contacts, if any, arise out of or are related to the causes of action in Plaintiff's suit. *See Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp*., 230 F.3d 934, 944 (7th Cir. 2000).

Plaintiff contends that the Defendants have minimum contacts with Illinois because they had a lengthy membership in the Ace Hardware co-op, owned millions of dollars in Ace Hardware stock, bought hundreds of millions of dollars' worth of merchandise (including privately-labeled paint that was manufactured in Illinois) from Ace Hardware, received millions of dollars of patronage dividends from Ace Hardware in Illinois, were extended millions of dollars of credit from Ace Hardware in Illinois, and otherwise came to be associated with an Illinois-based organization. (Plaintiff's Resp. at 13.) Plaintiff also argues that although the forum clauses in the Membership Agreements are permissive and therefore do not require Plaintiff to bring suit in Illinois, they nevertheless evidence Defendants' consent to be sued in Illinois. Defendants, on the other hand, argue that Defendant Massó's former membership in the Ace Hardware cooperative, and activities in the past that relate to that membership, cannot be used as a basis for personal jurisdiction because Ace Hardware is not a party to this case. (Defs.' Reply at 3-4.)

1. **The Court may consider Defendants' contacts with Illinois during the time it had a contractual relationship with Ace Hardware even though Ace Hardware is not a party to this lawsuit**

Defendants contend that Ace International cannot rely on Defendants' past membership in Ace Hardware, or any activities related thereto, as a predicate for establishing personal jurisdiction over Defendants in this case because Ace Hardware is not a party and because Defendants and Ace Hardware no longer have a contractual or other relationship with each other. *See* Defs' Reply at 4-5. Defendants' argument, however, misses the mark. Ace International brought its Complaint as assignee of Ace Hardware, and the case relates directly to Membership Agreements between Defendants and Ace Hardware. As assignee, Ace International is entitled to assume all rights that Ace Hardware possessed against Defendants under those Agreements. *See Perry v. Global Auto Recycling, Inc*., 227 F.3d 950, 953 (7th Cir. 2000). Accordingly, Defendants' contacts with Illinois related to those Membership Agreements are highly relevant to the Court's personal jurisdiction analysis. *See RM Petroleum, Inc. v. La Oasis, Inc*., No. 03 C 3358, 2004 WL 406984, at *4 (N.D. Ill. Feb. 5, 2004) (finding the defendants' pre-assignment contacts with Illinois were relevant, even though the assignor was not a party to the litigation, because "in breach of contract cases, the focus is on Defendants' contacts with the forum which relate to the contract itself").

2. **Defendants had sufficient contacts with Illinois related to the Membership Agreements**

It is well-established in the Seventh Circuit that "personal jurisdiction cannot be premised on corporate affiliation or stock ownership alone." *Reimer Express World Corp*., 230 F.3d at 943. It is also well-established that contracting with an out-of-state party does not, by itself, establish sufficient minimum contacts with the other party's forum. *Burger King*, 471

U.S. at 478-79. Rather, the court must view "the contract in the context of the entire transaction of which it is a part." *Id.* In this regard, the Seventh Circuit has instructed that in determining whether specific jurisdiction exists in a breach of contract case, the district court may consider only the dealings between the parties with respect to the disputed contract in its minimum contacts analysis. *Hyatt*, 302 F.3d at 717; *RAR*, 107 F.3d at 1277. Specifically, district courts must determine whether "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" indicate "the purposeful availment that makes litigating in the forum state foreseeable to the defendant." *RAR*, 107 F.3d at 1277 (citing *Burger King*, 471 U.S. at 478-79). While a court cannot "simply aggregate all of a defendant's contacts with a state–no matter how dissimilar in terms of geography, time or substance–as evidence of the constitutionally-required minimum contacts," it may consider the defendant's past contacts with Illinois if they "either bear on the substantive legal dispute between the parties or inform the court regarding the economic substance of the contract." *RAR*, 107 F.3d at 1278; *see also uBid*, 623 F.3d at 429.

Defendants had the requisite minimum contacts with Illinois related to the Membership Agreements to confer the Court with personal jurisdiction over them. Defendants contracted with Ace Hardware, an Illinois resident, by signing the Membership Agreements at issue in this case. Through those agreements, and their actual conduct related to those agreements, Defendants "purposefully availed" themselves of the benefits and privileges of Illinois. *See uBid*, 623 F.3d at 429 (the defendant's minimum contacts must relate to the plaintiff's claim).

Defendants became a member of Ace Hardware's co-op and purchased stock in the co-op

by virtue of their obligations under the Membership Agreements. (Compl. at Exhibit A, Membership Agreement between Caguas Lumber Yard, Inc. and Ace Hardware at Article II, ¶ 1.) Defendants knew they were contracting with an Illinois resident because the Membership Agreements stated on their face that Ace Hardware's general offices were located in Oak Brook, Illinois. (*Id.* at 1.) Although Defendants contend that they signed the contracts in Puerto Rico, they do not dispute that Ace Hardware signed many of the contracts in Illinois or that the contracts, on their face, stated that they would not become effective "unless and until [the contract] has been duly accepted and countersigned by [Ace Hardware] at its principal office in Illinois." (*Id.* at Article V, ¶ 1.) Moreover, in order to gain membership in Ace Hardware's co-op, Defendants had to submit an application for membership to Ace Hardware in Illinois. (Ting Decl. ¶ 12 and Exhibit C thereto.)

The purview of the Membership Agreements was broad–they essentially governed the parties' relationship, and they imposed certain rights and obligations on both parties. By virtue of their membership in Ace Hardware's co-op, Defendants had the benefit of using the words "ACE" and "ACE Hardware" to identify and promote their retail businesses (*id.* at Article I, ¶ 1), and they received patronage dividends on a yearly basis from Defendants based on net earnings (*id.* at Article I, ¶ 5; Ting Decl. ¶ 11). Defendants further had the right to purchase merchandise from Ace Hardware (*id.* at Article I, ¶ 2) and re-sell it in Puerto Rico, and they indeed did so. When they purchased merchandise, supplies or services from Ace Hardware, the Membership Agreements required them to transmit their orders to Ace Hardware in Illinois. (*Id.* at Article V, ¶ 1.) The Membership Agreements also provided that Defendants had to send payments for that merchandise to Ace Hardware in Illinois (*id.* at Article II, ¶ 3), and they indeed did so. Although

the parties agree that Ace Hardware often shipped the merchandise to Defendants from its regional distribution centers outside of Illinois, it is undisputed that its employees in Illinois had to authorize those shipments before they occurred.  (Ting Decl. ¶ 14.)  It is also undisputed that Defendants purchased "millions of dollars" in paint directly from Ace Hardware's paint plant in Illinois and that Ace Hardware provided private-labeled Massó brand paint for Defendants, which was manufactured and labeled in Illinois.  (*Id*.)  Further, the Membership Agreements obligated Defendants to pay Ace Hardware for national and regional advertising programs, which were administered in Illinois.  (*Id.* at Article II, ¶ 6.)  Defendants were also required to comply with all provisions of Ace Hardware's by-laws.  (*Id.* at Article II, ¶ 17.)  When Defendants disputed monies owed for merchandise they purchased from Ace Hardware, they would speak with Ace Hardware's Illinois employees about those disputes.  (Ting Decl. ¶ 27.)  Finally, Defendants sent representatives to Illinois at least twice – in July 2005 and September 2007 – to participate in Ace Hardware's training programs.  (Ting Decl. ¶ 25.)  All of these contacts relate to the Membership Agreements.

In *Burger King*, the Supreme Court affirmed the lower court's exercise of jurisdiction over a defendant in similar circumstances as this case.  471 U.S. at 479-80.  There, the Supreme Court held that a Florida court had personal jurisdiction over a non-resident defendant franchisee where the franchisor was a Florida resident.  *Id.* at 479.  Despite the defendant having had no physical contact with Florida except for his partner's attendance at a brief training course, the Supreme Court nevertheless determined that the defendant was subject to personal jurisdiction in Florida because the defendant (1) negotiated, via phone and mail, the franchise agreement with the plaintiff, a Florida corporation; (2) was allowed to use the franchisor's name and trademark;

and (3) benefitted, over a long period of time, from affiliation with the plaintiff's national organization. The Supreme Court also reasoned that the defendant's refusal to make the contractually required payments in the forum state as well as the plaintiff's use of the trademark after being terminated as a franchisee caused foreseeable injury to the plaintiff in Florida, and therefore it was "presumptively reasonable for [the defendant] to be called to account there for such injuries." *Id.* at 480. Similarly, Defendants were allowed to use the "Ace" name and trademark, benefitted from affiliation with Ace Hardware's national organization, whose headquarters are in Illinois, and had discussions with Ace Hardware's Illinois employees regarding its payment obligations for the merchandise it purchased from Ace Hardware. Moreover, like in *Burger King*, Defendants' alleged non-payment has caused a foreseeable injury to Ace Hardware in Illinois.

Courts have exercised personal jurisdiction over non-resident members of resident cooperative organizations in factually similar circumstances. In *TruServ Corp. v. ST Yards, Inc.*, No. 99 C6806, 2001 WL 743642 (N.D. Ill. June 29, 2001), for example, the court exercised personal jurisdiction over an out-of-state defendant, which was a member of the plaintiff co-operative. After finding that an enforceable forum selection clause in the agreement mandated that the dispute be decided in Illinois, it went on to explain that even if the court were to ignore the clause, jurisdiction would still be proper based on the defendant's contacts with Illinois. *Id.* at *5. Specifically, the court relied on the fact that (1) the credit relationships (which related to the contract at issue) between the plaintiff co-op and the defendant member were governed through a department in Illinois; (2) the plaintiff co-op's buyers of merchandise and services were in Illinois; (3) the members' orders were coordinated in Illinois and then relayed to regional

distribution centers; (4) the members' accounts were coordinated and updated in Illinois; and (5) the co-op's national advertising program was coordinated in Illinois. *Id.* The court also noted that it had personal jurisdiction under the Illinois long-arm statute, 735 ILCS 5/2-209(f), because the defendants' purported breach of the contract "arose from" the Illinois-based relationship of the parties. *Id*. at *5 (citing *Aetna Cas. & Sur. Co. v. Crowther, Inc*., 221 Ill. App.3d 275, 581 N.E.2d 833 (3d Dist. 1991)).[6]

Similarly, in *Servistar Corp. v. Home Hardware Co.*, 96 B.R. 593 (W.D. Penn. 1989), the court exercised personal jurisdiction over the defendant, an Illinois corporation that was a member of the plaintiff's purchasing cooperative. Like Ace Hardware, the plaintiff purchased goods in bulk and then sold them to its members pursuant to a retailer agreement. As in this case, the plaintiff sued the defendant to recover money the defendant allegedly owed the plaintiff under the retailer agreement. The court, analogizing the case to *Burger King*, determined that the defendant had "purposefully availed" itself of the privilege of conducting business in Pennsylvania because (1) it "applied for membership in the plaintiff's Pennsylvania-based co-op and enjoyed the benefits of its national organization"; (2) it "initiated numerous letters and phone calls direct to plaintiff in Pennsylvania, both in negotiating the agreements and in conducting business under them"; (3) as a result of their affiliation with the plaintiff, the defendants were entitled to use the plaintiff's name and trademark; (4) the defendants "were

---

[6] Defendants' attempt to distinguish *TruServ* based on their contention that the court based its decision on the fact that *TruServ* distributed profits to members is unavailing. First, the court did not base its decision on that sole fact. Second, like the defendants in *TruServ*, Defendants here received profits on a yearly basis from Ace Hardware in the form of patronage dividends. (Ting Decl. ¶ 11.) Indeed, Plaintiff have submitted uncontradicted evidence that Defendants have received millions of dollars in patronage dividends during their affiliation with Ace Hardware. (*Id.*)

required to make payments to a Pennsylvania bank and their failure to make payments caused a loss to a Pennsylvania corporation"; and (5) the retail agreements specified that they were "formed in Pennsylvania and are governed by Pennsylvania law." *Id.* at 595. Similar, if not identical, facts are present in this case.

## III. Traditional Notions of Fair Play and Substantial Justice

The next question is whether asserting personal jurisdiction over Defendants would offend "traditional notions of fair play and substantial justice." *uBid*, 623 F.3d at 425 (citing *Int'l Shoe*, 326 U.S. at 316). In doing so, the Court must consider "the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in efficiently resolving controversies, and the shared interest of the states in furthering fundamental substantive social policies." *uBid*, 623 F.3d at 432 (citing *Burger King*, 417 U.S. at 476).

The Court's exercise of personal jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice. Although there is a moderate burden on Defendants, both of which are located in Puerto Rico, to litigate a case in Illinois, Defendants consented to jurisdiction in Illinois (even though their consent was conditional) and therefore cannot now claim unfair surprise at being sued here. Moreover, although Plaintiff is a Bermuda corporation, it is a foreign subsidiary and assignee of Ace Hardware, an Illinois corporate resident and is seeking to enforce the rights of that corporation. *See* 735 ILCS 5/2-102(a) (providing that any private corporation authorized to transact business in Illinois is a resident of any county in which it has a registered office or other office or is doing business); *uBid*, 623 F.3d at 432 (recognizing Illinois' "significant interest in providing a forum for its residents to seek relief when they suffer

harm in Illinois from a wrong that occurred at least in part in Illinois"). The harm to Ace Hardware occurred in Illinois. Given Defendants' long-term contractual relationship with Ace Hardware in Illinois, spanning over the last 24 years, they could have anticipated being haled into court in Illinois. *Burger King*, 471 U.S. at 476-77.[7]

## IV. Motion to Transfer Venue

Defendants seek to transfer this action to the District Court of Puerto Rico, where they have filed a lawsuit against Plaintiff and other related entities.[8] Defendants filed their lawsuit three months after Plaintiff filed its Complaint in this matter.

### A. Venue is proper in both the transferor and transferee court

In diversity cases, such as this one, venue is proper in a judicial district where (1) any defendant resides, if all defendants reside in the same state, (2) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) any defendant is subject to personal jurisdiction at the time the action is commenced. 28 U.S.C. § 1391(a). Defendants reside in Puerto Rico, and therefore venue is proper in the District Court of Puerto Rico. Because a substantial part of the events giving rise to Plaintiff's breach of contract claim occurred in Illinois, venue is proper in the

---

[7] Moreover, Defendants' consent to Illinois jurisdiction, while not sufficient by itself to establish the Court's personal jurisdiction over them, nonetheless provides additional support for the Court's exercise of jurisdiction. Given Defendants' repeated acknowledgment in the Membership Agreements that Ace Hardware "may" sue Defendants Illinois, they cannot claim credibly that they could not have anticipated "being haled into court" here. *Burger King*, 471 U.S. at 476-77.

[8] Plaintiff, along with Ace Hardware, has filed a motion to transfer the Puerto Rico case to this district. *See* Case No. 11-cv-1684 (D.P.R.), Docket #11. They have asked the Puerto Rico District Court to stay resolution of the motion to transfer pending the outcome of Defendants' current motion. *See id.* at 16.

Northern District of Illinois.  *See* 28 U.S.C. § 1391(a)(2).

Defendants contend that venue in this Court is improper because the parties agreed that Ace Hardware could not sue Defendants in Illinois if doing so would violate Puerto Rican law. *See* Defs.' Reply at 14-15 (referring to Membership Agreements).  Defendants, however, have cited no Puerto Rican law that prohibits Plaintiff from suing Defendants in Illinois.  Defendants rely on 10 L.P.R.A. § 278b2 in support of their argument, which provides that "any stipulation that obligates a dealer to adjust, arbitrate or litigate any controversy that comes up regarding his dealer's contract outside of Puerto Rico . . . is null and void."  That provision merely prohibits the enforcement of mandatory forum selection clauses that *require* parties to litigate Law 75 claims outside of Puerto Rico.  It does not, as Defendants contend, prohibit Plaintiff from suing Defendant outside of Puerto Rico in the absence of a mandatory forum selection clause.[9]  Indeed, the parties concede, and the Court has determined, that the forum clause in the Membership Agreements is permissive.  Therefore, venue in this District is proper.

**B.      Transfer to Puerto Rico will not serve the convenience of the parties and**

---

[9]  Defendants also rely on the Puerto Rico Court of Appeal's decisions in *Maxon Engineering Servs., Inc. v. M.R. Franceschini, Inc.*, 2001 PR App. LEXIS 2028 (2001) and *Location Travel Corp. v. Business Travel Int'l BV et al.*, 2007 PR App. LEXIS 2243 (2007).  The Court was unable to obtain copies of either case in the English language, and was informed by the Puerto Rican District Court's library that such opinions are not available in English.  Based on Defendants' own characterization of those cases, however, they hold that a forum selection clause *forcing* the parties to litigate Law 75 claims outside of Puerto Rico are invalid.  They do not address the issue of whether Puerto Rican law prohibits parties from litigating breach of contract claims outside of Puerto Rico.

**witnesses, and it will not promote the interests of justice**

In making the determination of whether transfer of this case to Puerto Rico will serve the convenience of the parties and witness and promote the interests of justice, courts consider both private and public interests. *Tri3 Enters*., 2011 WL 2550736, at *1 (citing *Nalco Co. v. Env'tl Mgmt., Inc*., 694 F. Supp.2d 994, 998 (N.D. Ill. 2010) and *Methode Elec., Inc. v. Delphi Auto. Sys., LLC*, 639 F. Supp.2d 903, 907 (N.D. Ill. 2009)). The private interests include: "(1) the plaintiff's choice of forum; (2) the situs of the material events; (3) the relative ease of access to sources of proof; and (4) the convenience to the witnesses and parties." *Tri3 Enters*., 2011 WL 2550736, at *1 (citing *Research Automation*, 626 F. 3d at 978 and *Nalco*, 694 F. Supp.2d at 998). The public interest factors include the congestions of the respective court dockets, prospects for a speedy trial, and the court's familiarity with the applicable law. *See Research Automation*, 626 F.3d at 978. "Transfer is inappropriate if it merely transforms an inconvenience for one party into an inconvenience for another party." *Schwartz v. Nat'l Van Lines, Inc*., 317 F. Supp.2d 829, 835 (N.D. Ill. 2004).

### 1. Private Interest Factors

Plaintiff's choice of forum is entitled to deference here, where Illinois has a significant relationship to the material events leading to the litigation. *Id.* at 979.[10] Defendants argument that they performed their part of the Membership Agreements in Puerto Rico is unavailing because the issues in this case surround Defendants' alleged non-payment of debts they owe to

---

[10] The Seventh Circuit noted in *Research Automation* that where there is an identical suit pending in a different forum, this factor does not weigh in either party's favor. The Puerto Rico action, however, is not identical to this suit. Even if this factor were neutral, transfer to Puerto Rico would still not be warranted.

an Illinois corporate resident. Defendants further argue that Plaintiff's breach of contract claims are a part of a much larger dispute between the parties as outlined in their complaint in the Puerto Rico action. Those claims, however, are not presently before the Court. Even if they were, Defendants have not demonstrated that material events relating to those claims did not occur, at least in part, in Illinois. The sources of proof factor is neutral given that "transferring documents from one district to another is commonplace and, given the widespread use of digital imaging in big-case litigation, no more costly than transferring them across town." *See Rabbit Tanaka Corp. USA v. Paradies Shops*, 598 F. Supp.2d 836, 840 (N.D. Ill. 2009).

"With respect to the convenience evaluation, courts generally consider the availability of and access to witnesses, and each party's access to and distance from resources in each forum." *Research Automation*, 626 F.3d at 978. "The convenience of the witnesses is often considered the most important factor in the transfer analysis." *See Schwartz*, 317 F. Supp.2d at 836. "To determine the convenience to the witnesses, the court must look to the nature and quality of the witnesses' testimony with respect to the issues of the case." *Id.* Also, "the convenience of non-party witnesses is more significant than party witnesses because party witnesses normally appear voluntarily." *Tri3 Enters.*, 2011 WL 2550736, at *2 (citations omitted). Defendants have not met their burden of showing that this factor weighs in favor of transfer. They generally assert that many of Plaintiff's witnesses reside in Alabama and Florida, and that it would be more convenient for them to appear in Puerto Rico than Illinois. Since those witnesses are under the control of Plaintiff, however, that argument is of little weight. Further, Defendants do not offer names of specific witnesses, either party or non-party, that reside in Puerto Rico. Plaintiffs, on the other hand, list twelve party witnesses who reside in Illinois, and they provide the topics on

which each respective witness will testify.    Therefore, this factor weighs in favor of litigating the case in Illinois.[11]

Plaintiff argues that by consenting to jurisdiction in Illinois, Defendants have waived their right to object to venue in Illinois.  The Seventh Circuit has held that when a party "agrees to a permissive forum selection clause which specifically provides for the waiver of convenience-based objections to suits brought in a particular venue," it may not object to venue in the chosen forum based on cost or inconvenience.  *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 526 (7th Cir. 2001).  The permissive forum selection clause here, however, did not contain an "express waiver" of convenience-based objections and therefore Defendants did not waive their argument.  That said, their consent to jurisdiction in Illinois, albeit conditional, weighs against Defendants' argument to transfer.  *See Miller v. SKF USA, Inc*., No. 10 C 6191, 2010 WL 5463809, at *4 (N.D. Ill. Dec. 29, 2010) ("[A] permissive clause . . . provides insight about the parties' venue preference because it reveals at least one location that both parties agreed was acceptable," and although such clause "may not weigh as heavily as a mandatory venue provision would, it still suggests that a transfer should be denied.").

### 2.    Public Interest Factors

Defendants offer no evidence to rebut Plaintiff's argument that the median number of months from filing to disposition for civil cases filed in the Northern District of Illinois is 6.2

---

[11] Defendants contend that even if the convenience of witnesses and parties factor does not weigh in its favor, it would be more convenient for the parties to litigate all of their disputes related to the transactions at issue in one forum.  The Court agrees.  Defendants also contend that they cannot transfer the Puerto Rico action to this Court, and therefore the Court must transfer this action to Puerto Rico.  As explained previously, however, Defendants have pointed to no Puerto Rico law that prohibits the parties from litigating disputes related to the Membership Agreements outside of Puerto Rico.

months, versus 11.3 months in Puerto Rico.[12]  Therefore, this factor weighs against transfer.

The Membership Agreements contain a choice-of-law provision stating that Illinois law will apply to the parties' disputes.  Defendants contend that Puerto Rico law will apply.  The Court need not make a choice-of-law determination at this time.  If Illinois law applies, the Court is obviously familiar with the law.  Even if Puerto Rico law applies to the parties' disputes, this factor alone does not warrant transfer.  *Cf. BMJ Foods, P.R., Inc. v. Metromedia Steakhouses Co.*, 562 F. Supp.2d 229, 234 (D. P.R. 2008) (transferring case to Texas federal court, stating "this court has found in the past that transferee courts are fully capable of resolving claims brought under Act 75 pursuant to Puerto Rico law") (citing *Aguakem Caribe, Inc., v. Kemiron Atlantic, Inc.*, 218 F. Supp.2d 199, 203 (D. P.R. 2002) and *Senador Int'l, Inc. v. King Bros Indus.*, 181 F. Supp.2d 51 (D. P.R. 2002)).

### C.    First-to-file rule

Plaintiff argues that the Court should give deference to its choice of forum because it filed its Complaint against Defendants in April 2011, whereas Defendants did not file their action against Plaintiff in Puerto Rico until July 2011.  The Seventh Circuit has "never laid down an inflexible rule that the prior filing controls."  *Research Automation*, 626 F.3d at 980 (citing *Warshawsky & Co. v. Arcata Nat'l Corp.*, 552 F.2d 1257, 1265 (7th Cir. 1977)).  In *Research Automation*, the Seventh Circuit declined to adopt a rigid first-to-file rule, stating that although it would have the "virtue of certainty and ease of application," the cost of such a rule was "too high" because it would encourage a race to the courthouse.  *Id.* at 980-81.  The Seventh Circuit

---

[12]  *See* http://www.uscourts.gov/uscourts/Statistics/JudicialBusiness/2010/appendices/C05Sep10.pdf.

also affirmed and clarified its prior holding in *Asset Allocation & Mgmt. Co. v. Western Emp'rs Ins. Co.*, 892 F.2d 566 (7th Cir. 1989), and stated that "the first-filed case may proceed where the principles that govern requests for transfer do not indicate otherwise." *Research Automation*, 626 F.3d at 980. "Where a case is filed first should weigh no more heavily in the district court's analysis than the plaintiff's choice of forum in a section 1404(a) calculation." *Id.* at 982. The Court finds that transfer to Puerto Rico is not warranted in this case under § 1404(a) regardless of the fact that Plaintiff filed this action before the Puerto Rico action.

Considering all of the factors above, Defendants have not persuaded the Court that transfer to the District of Puerto Rico is warranted.

## CONCLUSION

For the reasons set forth above, the Court denies Defendants' motion to dismiss for lack of personal jurisdiction and further denies its motion to transfer venue.

**Date:** October 25, 2011

ENTERED

_____
**AMY J. ST. EVE**
**United States District Court Judge**

28